AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**CELLULAR TELEPHONE ASSIGNED CALL NUMBER<br>(513) 908-2226, UTILIZED BY DIALLO BARNES,<br>WITH SERVICES BY AT&T** | )<br>)<br>)<br>)<br>)<br>)   Case No. 2:21-mj-294 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A to the Affidavit in Support of the Application, incorporated herein by reference.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B to the Affidavit in Support of the Application, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC 846 | Conspiracy to Possess with Intent to Distribute Controlled Substance<br>Attempt to Possess with Intent to Distribute Controlled Substance |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _365_ days (give exact ending date if more than 30 days: April 27, 2022 ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Ypsilantis, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____April 27, 2021____

City and state: ____Columbus, Ohio____

_____
Kimberly A. Jolson
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN MATTER OF APPLICATION OF )<br>THE UNITED STATES OF AMERICA )<br>FOR A WARRANT DIRECTING THE )<br>DISCLOSURE OF GPS/E911 )<br>LOCATION DATA RELATING TO THE )<br>AT&T TELEPHONE NUMBER )<br>**(513) 908-2226** ) | Magistrate No.<br><br>**[UNDER SEAL]** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, John Ypsilantis, being duly sworn, depose and say:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this Affidavit in support of an Application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(513) 908-2226,** registered to D B, 6457 GLENWAY AVE STE 193, CINCINNATI, OH 45211 [1], and utilized by Diallo BARNES (BARNES) (hereinafter the "**SUBJECT TELEPHONE**"), which is serviced by AT&T, a wireless telephone service provider.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.   The

---

       1.      Searches of open source databases revealed that Diallo BARNES is the listed registered agent of GLOBAL GPS INC. LLC, 6457 GLENWAY AVE STE 193, CINCINNATI, OH 45211.

requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a warrant directing the disclosure of GPS/E911 location data.

4.      I entered on duty at the FBI Academy in Quantico, Virginia on May 14, 2017. I am currently assigned to the to the FBI Cincinnati Division (Columbus Resident Agency) Joint Terrorism Task Force (the "JTTF"). I have been assigned to this squad since January 2021. From October of 2017 until January 2021, your Affiant was assigned to the FBI Pittsburgh Division Greater Pittsburgh Safe Streets Task Force. I was employed as a U.S. Border Patrol Agent with the Department of Homeland Security (DHS) Customs and Border Protection (CBP) from July 23, 2009, to May 13, 2017. From January 2012 until May 2017 your Affiant was assigned as a Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

5.      During the course of my employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal, national security, and international and domestic terrorism investigations, as well as investigations of criminal organizations involved in both the manufacturing and distribution of controlled substances. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both

2

the manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, and audio and audio/video recording devices. Additionally, I have personally participated in Title III wiretap investigations, pursuant to 18 U.S.C. § 2516, in the Northern District of Ohio (NDO) and the Western District of Pennsylvania (WDPA).

6.     For instance, within the last two (2) years, your Affiant was the lead agent in a federal investigation into a violent, neighborhood street gang known as "SCO". As a result of that investigation, from January of 2019 through May 2019, your Affiant obtained nine (9) Title III wiretap authorizations. As a result of that wiretap investigation, thirty-three (33) individuals were charged by a federal grand jury in three (3) related Indictments for violations of federal drug and firearm laws. *See US v. Chadlin Leavy, et al*., Crim. No. 19-160 (WDPA June 4, 2019), *US v. Howard McFadden, et al*., Crim. No. 19-162 (WDPA June 4, 2019), *US v. Eric Vanderslice*, et al., Crim. No. 19-163 (WDPA June 4, 2019).

7.     Additionally, within the last year, your Affiant was the lead agent in a federal investigation into the violent, outlaw motorcycle gang known as the Pagan's Motorcycle Club. As a result of that investigation, from August of 2020 through December 2020, your Affiant obtained ten (10) Title III wiretap authorizations. As a result of that wiretap investigation, thirty (30) individuals were charged by a federal grand jury in three (3) related Indictments for violations of federal drug and firearm laws. *See US v. Jeffrey Kushik, et al*., Crim. No. 20-374 (WDPA

3

December 1, 2020), *US v. Anthony Peluso, et al.*, Crim. No. 20-375 (WDPA December 1, 2020), *US v. Bill Rana*, et al., Crim. No. 20-377 (WDPA December 1, 2020).

8.    In addition to the training I received at the FBI Academy and the U.S. Border Patrol Academy, I have received specialized training from the FBI and DHS/CBP focused on topics such as drug interdiction, drug detection, money-laundering techniques and schemes, drug identification, asset identification and removal, and methods utilized by organized criminal enterprises and drug trafficking organizations to carry out the aforementioned criminal conduct.

9.    Through the investigations that I have participated in, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, outlaw motor cycle gangs, street gangs, and prison gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and/or firearms, and to collect and launder related proceeds.

10.    I know that it is common practice for drug traffickers to routinely utilize telephones (including cellular phones and prepaid phones), calling cards, text messaging, email, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from law enforcement detection.    It is not uncommon for drug traffickers to initiate such mobile or prepaid telephone service in the name of an associate or family member or in the name of a fictitious individual.    Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances.    Moreover, it is not uncommon for drug traffickers to utilize

multiple telephone numbers – for instance, a buyer telephone and an associate telephone – as an additional means to avoid law enforcement detection.

11.     Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the coded language and deceptive linguistic practices typically used by drug traffickers.   I have spent many hours reviewing and transcribing such coded language, including in preparation for federal indictments and trials. This process of reviewing and transcribing thousands of intercepted communications, in conjunction with my other experience, has confirmed that it is now common practice for drug traffickers to utilize all communication features of their telephones, most notably, the voice call and text message features, nearly simultaneously to communicate with their conspirators.   For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages.   In fact, it is now quite unusual for a drug trafficker to utilize solely one (1) feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further their criminal activities.

12.     I have personally participated in the instant investigation, which is an investigation into the criminal activity, including drug trafficking, of individuals who are members and/or associates of a violent, street and prison gang known as the Hamilton County Bloods, hereinafter the "HCB." [2]

13.     The BLOODS street gang, while a national organization, operates "sets and/or subsets" in various cities and counties in the United States.   This investigation pertains to the HCB set or subset operating in and around the Southern District of Ohio, including in Hamilton,

---

[2]     Unless otherwise noted, throughout this Affidavit, the term "HCB" will be utilized to collectively describe the members, facilitators, and/or sources(s) of supply involved in the ongoing drug trafficking conspiracy in regard to the HCB set and/or subsets operating throughout the ODRC prison system more specifically RCI and NCI.

Butler, Montgomery, Franklin, Ross, and Noble counties, and, more specifically, in and around the Ohio Department of Rehabilitation and Correction (ODRC) prison system to include Ross Correctional Institution (RCI) and Noble Correctional Institution (NCI).

14.     This combined Application and Affidavit specifically relates to an ongoing investigation into members and/or associates of the HCB, which is a violent street and prison gang, its suppliers and higher-level drug-dealers, including BARNES, and others known and unknown, and the ongoing use of the **SUBJECT TELEPHONE**, by BARNES, to conspire to distribute and to distribute controlled substances in the Southern District of Ohio, in violation of Title 21, United States Code, Sections 841 and 846 (the "TARGET OFFENSES").

15.     I submit that the following establishes probable cause to believe that the target offenses have been committed, are still being committed by BARNES, and that BARNES, the user of the **SUBJECT TELEPHONE**, along with others, known and unknown, committed that crime, and that the information likely to be received concerning the location of the **SUBJECT TELEPHONE**, which is used by BARNES, will constitute evidence of that crime – in that, information about the location of the cellular telephone will be useful in, among other ways, tracking the movements and activities of BARNES, continuing to identify the drug trafficking associates of BARNES, locating potential stash houses where drugs and drug proceeds are stored, and drugs are processed as well as an aid in conducting physical surveillance with less risk of being detected.

### BASIS FOR FACTS/CIRCUMSTANCES CONTAINED IN THIS AFFIDAVIT

16.     The information contained within this Affidavit is derived from my personal knowledge, obtained as a result of my participation in this investigation, as well as from the following sources of information:

6

a.  Non-consensual and consensually monitored and recorded communications;

b.  Oral and written reports about this and other investigations that I have received, directly or indirectly, from state and local officers and detectives, as well as federal agents and task force officers;

c.  Surveillance that has been reported to me, either directly or indirectly;

d.  Review of telephone toll records and pen register/trap and trace information;

e.  Independent investigations by local law enforcement organizations;

f.  Reports from controlled/undercover drug purchases; and,

g.  Interviews/conversations with confidential sources.

17.  Except where otherwise noted, the information set forth in this Affidavit has been provided to me directly or indirectly by FBI agents and/or task force officers or local law enforcement agents/officers.

18.  Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided to me by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated.

19.  Similarly, information resulting from surveillance (except where otherwise indicated) does not set forth my personal observations, but rather observations that have been provided directly or indirectly to me through other law enforcement officers who conducted such surveillance.

20.  Whenever I state a belief, that belief is based upon my training and experience, as well as information obtained during this investigation.

21.     Further, I do not rely upon facts not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this Affidavit in support of the Application for the disclosure of location data relating to a wireless device.

22.     Because this Affidavit is being submitted for the limited purpose of seeking authorization for disclosure of location data relating to a wireless device, I have not set forth each and every fact learned during the course of this investigation.   Instead, I have set forth only those facts that I believe are necessary to establish the requisite probable cause to support a warrant authorizing the disclosure of location data relating to the **SUBJECT TELEPHONE**.

### FACTS ESTABLISHING PROBABLE CAUSE

23.     This investigation is the result of efforts by the FBI, Ohio State Highway Patrol (OSHP), ODRC Investigators, and other federal and local law enforcement agencies (LLEA) to investigate and prosecute individuals involved and/or associated with HCB, a violent street and prison gang, which is known by law enforcement to engage in criminal activities to include drug trafficking, violent crimes, homicide, smuggling of drugs to inmates in prison, and money laundering.

24.     The HCB operates primarily in/throughout the Southern District of Ohio.

25.     The HCB is made up of a network of members and associates both outside and inside of the ODRC prison system.

26.     BARNES has several prior drug related arrests and/or convictions to include; 1997 - Felony Distribution of Cocaine and Use of Communication Facility, 2002 – Felony Drug Possession, Felony Conspiracy to Commit Drug Trafficking, Possession of Cocaine, Trafficking in Cocaine, 2011 – Felony Trafficking in Drugs, Trafficking in Cocaine, Felony Possession of

8

Drugs, Felony Having Weapon Under Disability.   BARNES was convicted of Felony Trafficking in Drugs and Felony Having Weapon Under Disability in 2012.   Based on these convictions BARNES was sentenced to nine (9) years confinement.   BARNES was granted parole and released from prison on April 30, 2020 and is currently under the supervision of Ohio Parole Authority until April 30, 2025.

27.    HOWARD has prior drug related arrests and/or convictions to include; 2006 – Felony Trafficking in Drugs, Trafficking in Cocaine, 2007 – Having Weapons While Under Disability, Murder.   HOWARD was convicted of Murder in or around November 5, 2007 and was sentenced to fifteen years (15) years to life.   HOWARD is currently incarcerated at RCI and may be eligible for parole in approximately 2029.

28.    A confidential source (hereinafter CS1) has been cooperating with law enforcement for less than one (1) year, and is currently motivated by consideration for criminal conduct.

29.    Between January 2021 and the present, CS1 was debriefed on numerous occasions.

30.    During these debriefings, CS1 identified BARNES as a known suboxone and synthetic marijuana (commonly referred to as K2) source of supply/trafficker and member of the HCB.

31.    CS1 is familiar with BARNES has provided both historical and current information on BARNES and his co-conspirators.

32.    CS1 informed law enforcement that BARNES, is known by the alias "BLO" or "BLOW" and was previously incarcerated at RCI.

33.    CS1 stated that BARNES is originally from the BOND HILL neighborhood in the Cincinnati, Ohio area.

9

34. CS1 indicated that BARNES smuggles drugs into RCI through the aid of a complicit prison staff member at RCI.

35. CS1 identified Richard EBERHART (EBERHART) as a close associate of BARNES and the HCB. CS1 advised that EBERHART was currently incarcerated at RCI and held the position of porter in the R&D department at RCI.

36. CS1 informed law enforcement that EBERHART, is known by the alias "ROWL" or "RAUL".

37. CS1 indicated that EBERHART is one of the main individuals who facilitates drug distribution to BARNES' customers and other HCB members and associates inside of RCI once the drugs are smuggled into the prison.

38. CS1 stated that EBERHART has been involved in the smuggling and distribution of drugs at RCI for several years. CS1 indicated that HCB and HEARTLESS FELON gang members at RCI took over EBERHART's drug distribution network when they learned of EBERHART's capabilities for drug distribution at RCI.

39. CS1 informed law enforcement that BARNES and EBERHART often use the online money transferring application "CASH APP" to facilitate payment for drug transactions.

40. CS1 identified that one of the CASH APP account names utilized by BARNES and EBERHART to facilitate payment for drug transactions is *Valleyboi1942*.

41. A confidential source (hereinafter CS2) has been cooperating with law enforcement for less than one (1) year and is currently motivated by the potential for monetary gain or other benefits.

42. Between January 2021 and the present, CS2 was debriefed on numerous occasions.

10

43.     During these debriefings, CS2 identified BARNES as a known suboxone, synthetic marijuana (commonly referred to as K2), and fentanyl source of supply/trafficker and member of the HCB.

44.     CS2 is familiar with BARNES has provided both historical and current information on BARNES and his co-conspirators.

45.     CS2 informed law enforcement that BARNES, is known by the alias "BLO" or "BLOW", and "T.O." and was previously incarcerated at RCI.

46.     CS2 stated that BARNES obtained drugs through the "dark-web" and is responsible for obtaining suboxone strips as well as manufacturing synthetic marijuana and fentanyl laced paper that was being smuggled into and distributed throughout RCI by BARNES and other HCB members and associates.

47.     CS2 identified Garfield HOWARD (HOWARD) as a close associate of BARNES and HCB member.   CS2 further indicated that HOWARD held a leadership role within the HCB drug trafficking organization at RCI and was a high-level drug trafficker of suboxone strips, synthetic marijuana laced paper, fentanyl laced paper, and cellular telephones at RCI and NCI.

48.     CS2 indicated that HOWARD was known to obtain approximately 1,000 suboxone strips at a time through drug shipments smuggled into RCI.

49.     CS2 stated one (1) suboxone strip sold for approximately $100 dollars U.S. currency per strip at RCI.   CS2 further stated that one (1) legal sized sheet of fentanyl or synthetic marijuana laced paper sold for approximately $1,000 U.S. currency per sheet at RCI

50.     CS2 informed law enforcement that HOWARD, is known by the aliases "G-FIELDS" and is currently incarcerated at RCI.

11

51.    CS2 identified that BARNES and HOWARD facilitate smuggling drug shipments into RCI through the aid of a complicit prison staff member or corrections officer at RCI whom works in the "Intake" or "R&D" department.

52.    CS2 identified EBERHART as a close associate of BARNES, HOWARD, and the HCB.   CS2 advised that EBERHART was currently incarcerated at RCI at held the position of porter in the R&D department at RCI.

53.    CS2 informed law enforcement that EBERHART, is known by the alias "ROWL" or "RAUL".

54.    CS2 indicated that EBERHART facilitates transporting the bulk drugs that were smuggled into the prison to HOWARD through prison medical packs.   CS2 stated that HOWARD and HCB members and associates would then separate and break the drugs down into smaller quantities for resale within RCI.   CS2 further indicated that once the drugs were separated into smaller quantities EBERHART would further distribute the drugs to HOWARD and BARNES' customers and other HCB members and associates inside of RCI.

55.    CS2 stated that HOWARD and BARNES coordinated drug trafficking activities primarily through communicating via cellular telephones.   CS2 stated that since HOWARD was located inside of prison and BARNES outside, HOWARD would utilize cellular telephones and sim cards that were smuggled into RCI to communicate with BARNES and other HCB members and associates.

56.    CS2 identified that is was common for inmates who were HCB members or associates that were subordinate to HOWARD to "hold" or take possession of his cellular telephone(s), drugs, and other contraband during the daytime hours.   This was done in order for HOWARD to insulate himself in case he (HOWARD) or his cell became scrutinized by corrections

12

officers, as cellular telephones and drugs were considered major contraband. CS2 informed law enforcement that although these subordinate HCB members and associates took physical possession of the cellular telephone(s), drugs, and other contraband they were not authorized to use them. CS2 further indicated that if a subordinate HCB member or associate were caught violating these rules HOWARD would have them physically assaulted by another HCB member or associate.

57.      CS2 informed law enforcement that in or around November 2020 BARNES and HOWARD engaged in a "face-time" telephone call via cellular phone where they discussed delegating HCB drug trafficking activities to other HCB members and associates at RCI as HOWARD was pending future transfer to NCI within the ODRC prison system. CS2 further informed law enforcement that it was decided at this time to delegate physical drug distribution operations at RCI to HCB members Dimitri ROGERS (ROGERS), Richard GARNETTE (GARNETTE) and HCB associate and HEARTLESS FELON gang member Marcus MINOR (MINOR).

58.      CS informed law enforcement that ROGERS, is known by the alias "TREE", GARNETTE, is known by the alias "WACO" or "WAKE", and MINOR, is known by the alias "BAM".

59.      CS2 indicated that HOWARD grew up with MINOR and they were from the same neighborhood in the Cincinnati, Ohio area.

60.      CS2 identified that ROGERS, GARNETTE, and MINOR would pay HOWARD and BARNES for drugs in advance through various CASH APP accounts. HOWARD and BARNES would then arrange for the drug shipments to be smuggled into RCI through ROGERS, GARNETTE, and MINOR through their established drug trafficking network at RCI. ROGERS,

GARNETTE, and MINOR would then further distribute the drugs and place additional drug orders once the drugs were sold and the process was repeated. CS2 indicated that ROGERS, GARNETTE, and MINOR would each purchase approximately $10,000 to $15,000 dollars U.S. currency worth of drugs at a time from HOWARD and BARNES.

61. CS2 identified Shay IRWIN (IRWIN) as a close associate of BARNES, HOWARD, and the HCB. CS2 advised that IRWIN was female who was not in prison who helped facilitate HOWARD, BARNES, and other HCB members and associates drug trafficking operations.

62. CS2 advised that HOWARD and BARNES often referred to IRWIN as the "Secretary" or "Global VP". CS2 further advised that IRWIN was paid approximately $10,000 U.S. currency per month for her assistance in facilitating their drug trafficking operations.

63. CS2 indicated that IRWIN often managed HOWARD and BARNES CASH APP accounts where proceeds from drug sales was funneled through.

64. CS2 identified that some of these CASH APP accounts contained the following names of *Valleyboy, Global,* and *Forever88.*

65. CS2 advised that IRWIN also ran or managed fictious business LLCs on behalf of HOWARD and BARNES. CS2 further advised that these fictious businesses where utilized to launder drug proceeds generated by HOWARD, BARNES, and HCB members and associates. CS2 identified one of these fictious businesses as a clothing company named *FOREVER88.*

66. CS2 advised that BARNES was involved in purchasing several properties with drug proceeds in the Cincinnati, Columbus, and Dayton, Ohio areas.

67. CS2 indicated that when HOWARD was transferred to NCI for a short period of time in or around December 2020, he was still facilitating drug trafficking operations at RCI with BARNES, ROGERS, GARNETTE, MINOR, and other HCB members and associates.

68.     CS2 identified that in or around January 2021, a cellular telephone and sim card that were of high value to HOWARD and utilized by HOWARD to facilitate HOWARD, BARNES, and other HCB members drug trafficking activities at RCI were seized by ODRC corrections officers and investigators at NCI.   At the time the cellular telephone and sim card were in the possession of Alfonso HENDERSON (HENDERSON).   CS2 indicated that HOWARD believed that he had lost the cellular telephone and sim card but CS2 advised that they were stolen from HOWARD and sold to HENDERSON unbeknown to HOWARD.

69.     On December 17, 2020, HOWARD was transferred to NCI from RCI.

70.     On January 13, 2021, ODRC Investigators and corrections officers at NCI conducted a cell inspection of HOWARD's cell and locker box.   During this inspection ODRC Investigators and corrections officers located and seized numerous sheets of paper laced with suspected synthetic marijuana concealed inside of Ramen Noodle Soup packets from HOWARD's locker box inside of his cell.

71.     On January 15, 2021, ODRC Investigators and corrections officers at NCI conducted a security inspection of HOWARD's person, cell, and locker box.   During this inspection ODRC Investigators and corrections officers located and seized a blue balloon partially concealed inside of HOWARD's rectum.   Upon further inspection it was revealed that the blue balloon contained approximately 57 suspected suboxone strips.

72.     On March 14, 2021, ODRC Investigators and corrections officers at RCI conducted a security inspection of GARNETTS's person, cell, and locker box.   During this inspection ODRC Investigators and corrections officers located and seized approximately several hundred suspected suboxone strips concealed inside of a stick of cocoa butter and peanut butter jar inside of GARNETTE's locker box.

73.     Your Affiant is aware that HOWARD's assigned ODRC GTL prison telephone account is A567193.   The telephone calls placed over the ODRC GTL system are recorded.

74.     Further, your Affiant has reviewed numerous recorded ODRC GTL telephone communications placed by HOWARD through his ODRC GTL phone system account, A567193. It is your Affiant's belief that several of these telephone communications recorded over ODRC GTL prison telephone system show that HOWARD is actively engaged in synthetic marijuana and suboxone[3] trafficking with BARNES via cellular telephones utilized by BARNES to include **SUBJECT TELEPHONE**.   The examples identified below are only some of the intercepted communications, and the descriptions of the communications reflect your Affiant's interpretation and explanation of the contents of the communications.   Your Affiant believes that these descriptions are accurate, although they may not be verbatim transcripts.

75.     On February 5, 2021, at approximately 6:52 PM, HOWARD placed an outgoing recorded ODRC GTL prison telephone communication to an unknown female who was utilizing (661) 319-7973 (UF7973).   Your Affiant has reviewed this call, based on your Affiant's training and experience, and your Affiant's knowledge of this investigation, the above-referenced conversation can be summarized as follows:   HOWARD instructs UF7973, to place a three-way telephone call to BARNES (DB) at (513) 377-9985.   HOWARD and BARNES discuss HOWARD's current situation after being caught with drugs, cellular telephones, and other contraband while at NCI.   HOWARD advises BARNES that HOWARD believes that he (HOWARD) will be transferred from NCI to a higher security prison.   Additionally, HOWARD and BARNES discuss HCB drug trafficking operations at RCI.   In addition, BARNES and

---

3.     Throughout this affidavit your Affiant will use the term "drugs" and/or "drug".   Unless specified when your Affiant utilizes this term your Affiant is referring to synthetic marijuana and/or suboxone.

16

HOWARD discuss that several HCB members and associates have been resupplied with drugs through the assistance of BARNES and HOWARD at RCI and will begin paying off their drug debts to BARNES and HOWARD in the near future.

76. On February 17, 2021, at approximately 5:07 PM, HOWARD placed an outgoing recorded ODRC GTL prison telephone communication to BARNES at (513) 377-9985. Your Affiant has reviewed this call, based on your Affiant's training and experience, and your Affiant's knowledge of this investigation, the above-referenced conversation can be summarized as follows: HOWARD and BARNES discuss HCB drug trafficking operations at RCI. In addition, BARNES and HOWARD discuss that several HCB members and associates were displeased with the quality and potency of drugs they had recently been supplied with. HOWARD and BARNES discuss also discuss the use of CASH APP to transfer money in furtherance of their drug trafficking activities. Further, HOWARD and BARNES discuss drug suppliers and obtaining a new drug shipment to replace the low-quality drugs that had been smuggled into and supplied to HCB members and associates at RCI. Additionally, BARNES and HOWARD discuss only using trusted drug going forward as the low-quality drug shipment is going to cause HOWARD, BARNES, and HCB members and associates to lose money.

77. On April 3, 2021, at approximately 4:06 PM, HOWARD placed an outgoing recorded ODRC GTL prison telephone communication to BARNES via **SUBJECT TELEPHONE:** Your Affiant has reviewed this call, based on your Affiant's training and experience, and your Affiant's knowledge of this investigation, the above-referenced conversation can be summarized as follows: BARNES and HOWARD discuss that HOWARD's sister is negatively effecting HOWARD, BARNES, and HCB drug trafficking activities. It is your Affiant's belief that when HOWARD and BARNES refence HOWARD's sister they are referring

17

to one of HOWARD's actual biological sisters who is involved in HCB's drug trafficking operations. Additionally, your Affiant believes that HOWARD's sister referenced above often facilitates drug transactions by relaying drug orders between HOWARD and BARNES and other HCB members and associates inside and outside of prison. Further, your Affiant believes that HOWARD's sister is involved in the transfer of money through various accounts to include CASH APP accounts in order to facilitate drug transactions on behalf of BARNES, HOWARD, and other HCB members and associates. Additionally, HOWARD and BARNES discuss other HCB members and associates and the need for each of them to communicate with HOWARD's sister as soon as possible in order to facilitate the next drug transaction. HOWARD and BARNES then discuss a new unidentified prospective drug supplier and details in regard to negotiating a deal with this prospective drug supplier. These details include prices, quantities, and transportation related to the prospective drug deal.

78.     Pen register/trap and trace analysis conducted by law enforcement officers involved in the investigation revealed that **SUBJECT TELEPHONE** is in frequent communication with individuals believed to be involved in HCB's drug trafficking operations.

79.     Pen register/trap and trace analysis conducted by law enforcement officers involved in the investigation revealed that **SUBJECT TELEPHONE** is currently active.

## CELLULAR DEVICES AND LOCATION DATA

80.     Your Affiant has been advised that **AT&T**, which services the **SUBJECT TELEPHONE**, is a company that provides cellular telephone access to the general public. Your Affiant also knows that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or

18

"cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

81.     E-911 Phase II data provides relatively precise location information about the cellular telephones themselves, either via GPS tracking technology built into the phones or by triangulating on the device's signal using data from several of the provider's cell towers.

82.     When directed pursuant to court order, **AT&T** will provide a designated law enforcement agency with periodically-updated physical location data with respect to the **SUBJECT TELEPHONE**. If, for any reason, the provider is unable to generate sufficient location information by sending a signal to the **SUBJECT TELEPHONE** or by otherwise using known reference points, the government requests that the provider furnish such other physical location data as is available, including information reflecting the tower and antenna face ("cell site") used by the **SUBJECT TELEPHONE** at the start and end of any call.

83.     Based on your Affiant's training and experience, your Affiant is aware that it is common for members and associates of drug trafficking organizations (DTOs) as well as street and prison gangs to conduct criminal activities across various federal districts throughout the United States due to the scope of their national reach and membership.

19

84.     Based on your Affiant's training and experience, your Affiant is aware that it is common practice for members and associates of DTOs as well as street and prison gangs to routinely utilize telephones (including cellular phones and prepaid phones), calling cards, text messaging, email, counter surveillance, false or fictitious identities, and coded communications to communicate with customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from law enforcement detection.   It is not uncommon for members and associates of DTOs as well as street and prison gangs to initiate such mobile or prepaid telephone service in the name of an associate or family member or in the name of a fictitious individual. Additionally, it is not uncommon for members and associates of DTOs as well as street and prison gangs to change cellular telephone numbers in attempt to thwart law enforcement detection. Members and associates of DTOs as well as street and prison gangs often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances.

85.     Additionally, your Affiant is aware that members and associates of DTOs as well as street and prison gangs often attempt to conceal the coordination and execution of their criminal activities, to include drug and firearm trafficking, through the use of encrypted messaging applications (apps) that can be accessed through "smart" cellular telephones.

86.     Further, your Affiant is also aware that "smart" cellular telephones emit location data during the use of these encrypted messaging apps or communications.

87.     This investigation has established that the information likely to be received concerning the location of the **SUBJECT TELEPHONE** will constitute evidence of that crime. Said information will be useful in, among other ways, tracking the movements and activities of

BARNES, continuing to identify the drug trafficking associates of BARNES, locating potential stash houses where drugs and drug proceeds are stored, and as an aid in conducting physical surveillance with less risk of being detected.

      88.    The investigation of BARNES, the HCB, and others known and unknown is ongoing.   The goals of this investigation is to establish and identify the following information:

    a.    The nature, extent, and methods of operation of their illegal drug trafficking;

    b.    The dates, times, places, and manner in which controlled substances are being delivered;

    c.    The identification of other communications facilities used in furtherance of the TARGET OFFENSES;

    d.    The methods and means of payment for the controlled substances possessed and distributed and the manner in which these transactions are conducted;

    e.    The locations where the controlled substances are stored;

    f.    The nature and extent of the mechanisms used to import, transport, and distribute controlled substances within the Southern District of Ohio and elsewhere;

    g.    The identities of co-conspirators, accomplices, aiders and abettors, and other participants, and their respective roles and participation in the TARGET OFFENSES;

    h.    The identities of the sources of supply of the controlled substances being distributed by BARNES, the HCB, and others known and unknown; and

    i.    Evidence of firearms used in furtherance of the drug trafficking activity and/or crimes of violence.

In doing so, your Affiant and investigators aim to determine the precise manner in which the criminal organization operates, and to dismantle the criminal organization through successful arrests and prosecution of BARNES and members of HCB, their associates, their sources of supply, other distributors, and any other co-conspirators assisting the criminal organization. Unfortunately, the goals of the investigation have not yet been fully achieved. Notification of BANRES to the disclosure of records and/or physical location data pertaining to the **SUBJECT**

**TELEPHONE** would very likely cause him to, among other things, discard the **SUBJECT TELEPHONE** he is currently using and further fortify and conceal his criminal operation. In doing so, evidence is likely to be lost or never obtained, suspects may flee this jurisdiction, and the safety of informants and law enforcement officers may be placed in danger.

### GOVERNMENT'S REQUESTS

89.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

90.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until thirty (30) days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **SUBJECT TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

91.     I further request that the Court direct **AT&T** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **AT&T**.

22

I also request that the Court direct **AT&T** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **AT&T's** services, including by initiating a signal to determine the location of the **SUBJECT TELEPHONE** on **AT&T's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

92.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **SUBJECT TELEPHONE** outside of daytime hours.

93.     I further request that the Warrant apply to any changed telephone number assigned to an instrument bearing the same ESN or IMEI numbers as the **SUBJECT TELEPHONE**, and to any changed ESN or IMEI number assigned to the same telephone number as the **SUBJECT TELEPHONE** within the period of disclosure directed by this warrant, and to any changed ESN or IMEI number assigned to the telephone number or telephone number assigned to the same ESN or IMEI numbers of the **SUBJECT TELEPHONE** if the **SUBJECT TELEPHONE** is ported to another service provider within the period of disclosure directed by this warrant.

## CONCLUSION

94.     Based upon the foregoing, it is respectfully submitted that there is probable cause to conclude that the records and physical location data of the **SUBJECT TELEPHONE** constitute evidence of crimes committed, and being committed, in the Southern District of Ohio. The records and physical location data will reflect where **SUBJECT TELEPHONE** and certain associates are located when criminal activity occurs and will also reflect, in conjunction with

23

physical surveillance and other investigative steps, those with whom the user of the **SUBJECT**

**TELEPHONE**, BARNES, is interacting.

The above information is true and correct to the best of my knowledge, information and

belief.

JOHN M. YPSILANTIS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this April 27, 2021.

Kimberly A. Jolson
United States Magistrate Judge

24

## ATTACHMENT A

### The Target Account(s)

1.    The cellular telephone assigned call number **(513) 908-2226**, registered to a D B, 6457 GLENWAY AVE STE 193, CINCINNATI, OH 45211 (hereinafter the "**SUBJECT TELEPHONE**").

2.    Records and information associated with the **SUBJECT TELEPHONE** that is within the possession, custody, or control of the Provider, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

All information about the location of the **SUBJECT TELEPHONE** described in Attachment A for a period of thirty (30) days, during all times of day and night.   "Information about the location of the **SUBJECT TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal the **SUBJECT TELEPHONE**.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government.   In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **SUBJECT TELEPHONE** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.   In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.   *See* 18 U.S.C. § 3103a(b)(2).

## II.      Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of federal law, including violations of Title 21, United States Code, Sections 841 and 846, involving **Diallo BARNES**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.